Ellis CANTY and Wanda Canty, his wife, Plaintiffs,

v.

A. BOTTACCHI, S.A. de NAVEGACION, and Seaport Crane Service, Inc., Defendants.

Wilfred BURNETT and Monica Burnett, his wife, Plaintiffs,

v.

A. BOTTACCHI, S.A. de NAVEGACION, and Seaport Crane Service, Inc., Defendants.

Nos. 91–0308–CIV, 91–1625–CIV.

United States District Court, S.D. Florida.

April 13, 1994.

Hyman Hillenbrand, Kroll & Tract, Allan R. Kelley, Fowler, White, Burnett, Burley, Banick & Strickroot, P.A., Miami, FL, for defendants.

Arthur Roth, Melvin C. Alldredge, P.A., Miami, FL, for plaintiffs.

## MEMORANDUM OPINION

HIGHSMITH, District Judge.

This cause came before the Court upon Defendant Seaport Crane Service, Inc.'s ("Seaport") Motion for Summary Judgment, filed August 26, 1993. For the reasons stated below, the Court denies Seaport's motion for summary judgment.

### INTRODUCTION

This is a consolidated action for damages, governed by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., for personal injuries sustained by two longshoremen as a result of an accident aboard a vessel. The plaintiffs and their spouses have brought this action against the vessel owner, Defendant A. Bottacchi, S.A. de Navegacion ("Bottacchi"), and the owner of a crane involved in the accident, Seaport. The plaintiffs allege they sustained injuries due to the negligence of Bottacchi and Seaport in the unloading of pipes off Bottacchi's vessel. Specifically, the plaintiffs assert that they were injured when the sling attached to Seaport's crane, and used to lift the pipes out of the cargo-hold, broke, causing a load of pipes to fall onto the plaintiffs. Seaport seeks summary judgment, holding that it is not liable for the plaintiffs' injuries. In this regard, Seaport asserts that the operators of the crane are borrowed servants of the plaintiffs' employer and, as such, Seaport, as lessor of the crane and its operators, shares the workers compensation immunity of the plaintiffs' employer.

### STANDARD OF REVIEW

In deciding a summary judgment motion, the Court must apply the standard set forth in Fed.R.Civ.P. 56(c), which states in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The United States Supreme Court has addressed the standard for summary judgment, as set forth in Rule 56(c), as follows:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After the moving party has met this initial burden, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Fed.R.Civ.P. 56(e), however, does not permit the nonmoving party to avoid summary judgment by resting on the pleadings, but "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, the mere existence of a scintilla of evidence in support

of the non-movant's position is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

## UNDISPUTED MATERIAL FACTS

The following undisputed facts are relevant to the disposition of Seaport's motion for summary judgment:

1. The plaintiffs were longshoremen employed by S.E.L. Maduro Florida, Inc. ("Maduro"), a stevedore company experienced in the unloading of vessels and in stevedoring operations. Maduro was engaged by Bottacchi to unload pipes from the hold of Bottacchi's vessel, the Puenta Malvinas, at the Port of Miami, Florida.

2. Seaport is an independent contractor in the business of renting cranes to all of the stevedoring companies in the Port of Miami. Maduro contracted with Seaport for the furnishing of a crane and two crane operators to assist in the unloading of the Puenta Malvinas. Maduro paid Seaport a lump sum per hour for the furnished crane, and Seaport paid the crane operators.

3. Seaport told its crane operators where to report for work and at what time. Maduro determined hours of operation, including overtime. Once on the job site, the crane was under the care, custody, and control of Maduro.

4. At the job site, Maduro was solely responsible for directing the unloading operations of the vessel. Maduro determined the position of the crane and of the longshoremen, and how to unload the vessel. Maduro determined what equipment (i.e., cable; sling configuration) to use, how many pipes to load onto the sling, and how fast to take the pipes out of the hold. Maduro positioned "flagmen" at key points to instruct the crane operator, via hand signals, when to lower and raise the boom and when to lift the cargo.

5. Maduro was solely responsible for inspecting the condition of the cable used during the unloading operation, and for ensuring that any cable in poor condition was not used or was replaced. Maduro was also responsi-

ble for ensuring that the pipes were properly secured in the sling, and that the sling was not overloaded. The crane operator had no responsibility whatsoever with regards to the selection, use, and condition of the cables.

6. Within the cab of the crane is a scale that indicates the weight of each load being lifted. During the course of the day, the crane operators would inform the flagmen of the weight of each load as it was lifted. The lifting capacity of a cable, however, is determined by the configuration of the sling. From their position in the crane, the crane operators could not tell whether the sling used was adequate for the job until the load was lifted out of the hold. At the time of the accident, the weight of the load which fell had not registered yet on the crane's scale.

7. On February 1, 1990, the plaintiffs were injured when a sling owned by Maduro broke while lifting pipes out of the hold of the vessel. Maduro was responsible for investigating the cause of the accident. However, the broken sling was lost while in Maduro's custody, so that a determination of why the sling broke was never made. Maduro's investigator did opine, however, that the crane's operations did not contribute to the accident. Moreover, none of the parties or witnesses recall the crane operations being anything other than smooth. At the time the sling broke, the load had not cleared the top of the cargo hold area.[1]

8. Maduro was responsible for providing a safe work environment for its employees, and for ensuring that the unloading of the vessel was performed in a secure and safe manner.

9. The crane operators' supervisor at Seaport would occasionally stop by various job sites where Seaport had rented its cranes to see how the work was progressing. The crane operators on the Maduro job verbally reported the accident to him.

10. The plaintiffs received workers compensation benefits from Maduro pursuant to the Longshore and Harbor Workers Compensation Act.

---

1. Although testimony in this regard is varied as to how high the load had been lifted at the time the sling broke, no one appears to dispute that

the load was still within the confines of the cargo hold.

**1556**

### DISCUSSION

 The Longshore and Harbor Workers Compensation Act ("the LHWCA") provides that every employer subject to the LHWCA shall be liable to its employees for workers compensation. 33 U.S.C. § 904. Such liability is exclusive and in place of all other liability, and extends to fellow servants. 33 U.S.C. §§ 905(a), 933(i); *Perron v. Bell Maintenance & Fabricators, Inc.*, 970 F.2d 1409, 1410 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1264, 122 L.Ed.2d 660 (1993). When a party other than the employer is liable for damages, the claimant need not elect his remedies. 33 U.S.C. § 933(a). Thus, the claimant may receive workers compensation benefits from his employer and still bring an action against a third party. *Potomac Elec. Power Co. v. Wynn*, 343 F.2d 295, 297 (D.C.Cir.1965). The issue before the Court is whether the crane operators provided by Seaport were the "borrowed servants" of Maduro during the unloading operation. Generally, this issue is a matter of law. *Gaudet v. Exxon Corp.*, 562 F.2d 351, 357–58 (5th Cir.1977) (King, J., sitting by designation), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). Moreover, because the issue is essentially one of determining the extent of coverage under the LHWCA, federal law applies. *Id.* at 357.[2]

#### 1. *The Borrowed Servant Doctrine.*

The borrowed servant doctrine was originally addressed by the United States Supreme Court in *Standard Oil v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909).[3] There, the Court held that, under the borrowed servant doctrine, "an employer will be liable through respondeat superior for negligence of an employee he has 'borrowed,' that is, one who does his work under his supervision and control." *Gaudet*, 562 F.2d at 355 (analyzing *Standard Oil*). In *Standard Oil*, a shipper contracted with a stevedore to load cargo onto a vessel. The cargo was loaded with the use of a steam winch provided by the shipper and operated by a winchman in the shipper's employ. The shipper received an agreed compensation from the stevedore for doing the hoisting itself. The stevedore provided all other equipment and labor. During the loading process, a longshoreman in the stevedore's employ was injured when the winchman negligently lowered a load of cargo into the hold. 212 U.S. at 218–19, 29 S.Ct. at 252–53.

The issue before the Court in *Standard Oil* was whether the winchman, at the time of injury, was the servant of the defendant or of the stevedore. In addressing this issue, the Court recognized that

> One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation.... It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became pro hac vice the servants of him to whom they are furnished.... In [this] case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen.

212 U.S. at 220–21, 29 S.Ct. at 253–54. The Court then held that the issue of whether a person is a borrowed servant turns upon who has the power and control to direct the servant in the performance of his work. *Id.* at 221, 29 S.Ct. at 254. In order for the master to be relieved of liability for the acts of its servant, "it must appear that that relation, for the time, had been suspended, and a new

---

2. In this regard, to the extent the parties rely on Florida law, such reliance is misplaced.

3. *Standard Oil* was decided prior to the enactment of the LHWCA, and employed the borrowed servant doctrine as a means of **imputing** liability. Although the doctrine has been applied as a means of **escaping** liability since the enactment of the LHWCA, the Court finds that this is a distinction without a difference. Thus, the doctrine as recognized by the Supreme Court in *Standard Oil* is applicable to the instant action.

like relation between the winchman and the stevedore had been created." *Id.* at 225, 29 S.Ct. at 255.

In *Standard Oil,* the Court found controlling the fact that the winchman was hired and paid by the shipper and could be fired by the shipper. In addition, the shipper used its own equipment and labor to furnish the hoisting work to the stevedore for an agreed price. The Court held that these facts did not support the conclusion that the servant's relationship with its master had been suspended, and a new like relationship created with the stevedore. *Id.* Moreover, the stevedore had no control over the movements and conduct of the winchman other than to conform the winchman's work hours to that of the longshoremen, and to provide hand signals to aid the winchman in the hoisting and lowering of cargo. The Court found that the use of hand signals in this case was "not the giving of orders, but of information; and the obedience to those signals showed cooperation rather than subordination, and is not enough to show that there was a change of masters." *Id.* at 226, 29 S.Ct. at 256. Accordingly, the Court held that the winchman remained the servant of the shipper. *Id.* at 227, 29 S.Ct. at 256.

### 2. *The Borrowed Servant Doctrine under the LHWCA.*

■ Subsequent to the Supreme Court's decision in *Standard Oil,* the LHWCA was enacted. Thereafter, the United States Court of Appeals for the Fifth Circuit established a nine-factor test for determining whether a person is a borrowed servant under the LHWCA. This test, which embodies and expands on the *Standard Oil* considerations, is composed of the following factors:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Ruiz v. Shell Oil Co.,* 413 F.2d 310, 313 (5th Cir.1969). While no single factor is dispositive, more emphasis is usually placed on the first factor, control over the employee. *Rosetti v. Avondale Shipyards, Inc.,* 821 F.2d 1083, 1085 (5th Cir.1987), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).[4] At the outset, the Court notes that the case *sub judice* is factually similar to *Standard Oil.* Therefore, its holding supports the Court's determination regarding this issue. Indeed, a number of post-*Standard Oil* cases involving crane operators have found no borrowed servant status. *See Roderick v. Bugge,* 584 F.Supp. 626 (D.Mass. 1984); *Lopez v. Oldendorf,* 545 F.2d 836 (2d Cir.1976), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2650, 53 L.Ed.2d 256 (1977); *Ware v. Cia De Navegacion Andes, S.A.,* 180 F.Supp. 939 (E.D.Va.1960).[5] *Cf. Sims Crane Serv., Inc. v. Ideal Steel Prods., Inc.,* 750 F.2d 884 (11th Cir.1985) (finding no borrowed servant status under Georgia bailment-for-hire statute). Nevertheless, the Court applies the *Ruiz* factors which mesh the Supreme Court's ra-

---

**4.** Although the Eleventh Circuit has not addressed the borrowed servant doctrine under the LHWCA, both the Third and Fourth Circuits have, and both have recognized the *Ruiz* factors. *See Peter v. Hess Oil Virgin Islands Corp.,* 903 F.2d 935, 942 (3d Cir.1990) (reciting *Ruiz* factors but applying *Gaudet), cert. denied,* 498 U.S. 1067, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991); *Huff v. Marine Tank Testing Corp.,* 631 F.2d 1140, 1143–44 (4th Cir.1980) (applying factors essentially similar to those in *Ruiz* ). Moreover, the United

States District Court for the District of the Canal Zone applied the *Ruiz* nine-factor test. *See Pinto v. The Vessel "Santa Isabel",* 492 F.Supp. 689, 696 (D.C.Z.1980).

**5.** See also *Wilson v. Nooter Corp.,* 475 F.2d 497 (1st Cir.), *cert. denied,* 414 U.S. 865, 94 S.Ct. 116, 38 L.Ed.2d 85 (1973), and *Ciejek v. Crane Serv. Co.,* 351 F.2d 788 (D.C.Cir.1965), both reversing directed verdicts premised on a finding of borrowed servant status.

tionale in *Standard Oil* with the subsequently evolved LHWCA.

3. *Application of the Ruiz Factors to Seaport.*

### A. Control

■ The first, and most critical factor, is: Who had control over the crane operators? It is undisputed that the crane itself was under Maduro's care and control. However, control over the crane operators was not as clearly defined. On the one hand, Seaport told the crane operators when and where to report for work. Once at the job site, Maduro determined hours of operation and overtime. This conforming of hours, however, was not sufficient to confer control on the stevedore over the winchman in *Standard Oil.* Additionally, Maduro, by the use of hand signals, informed the crane operators when to raise and lower the boom. These hand signals were interpreted by the Supreme Court in *Standard Oil* as cooperation and coordination, rather than direction and subordination. There, the Court concluded that the use of hand signals was not sufficient to show a change in control over the crane operator. Likewise, this Court concludes that the conforming of hours and use of hand signals in the instant case do not support a finding of change in control.

### B. Whose work was being performed

In this case, the unloading of the Puenta Malvinas was entirely Maduro's work, and Maduro was solely responsible for the working conditions and the potential hazards of the job. *Huff v. Marine Tank Testing Corp.,* 631 F.2d 1140, 1143 (4th Cir.1980).

### C. Agreement between borrowing and lending employers

With regards to this third factor, the record does not indicate whether any agreement or understanding was reached between Seaport and Maduro as to the status of the crane operators. Accordingly, the Court finds that this factor is neutral.

### D. Acquiescence of employee

■ Seaport is engaged in the business of hiring out cranes and crane operators to stevedoring companies. Accordingly, the crane operators employed by Seaport are presumed to have acquiesced to this sort of work arrangement and to the inherent working conditions that arise from the nature of the stevedoring business. A similar finding was made in *Capps v. N.L. Baroid–NL Indus., Inc.,* 784 F.2d 615, 617 (5th Cir.), *cert. denied,* 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986). In that case, the court stated that

> Since Capps worked for a company that loaned temporary employees, Capps knew Davis would send him into new work situations. Thus, going into new work situations was Capps' work situation. When he went to work for Davis, he acquiesced to the fact that Davis would constantly send him into new work situations.

*Id.*

### E. Termination of relationship with lending employer

■ This factor does not require a lending employer to completely sever its relationship with the employee. *Capps,* 784 F.2d at 617. To find a termination, however, would require that Seaport place no restrictions on the employment conditions of the crane operators. However, Seaport provided the operators for the exclusive purpose of operating the crane. Therefore, the Court finds that restraints were indeed placed on the crane operators' work for Maduro and, thus, the crane operators' relationship with Seaport was not terminated.

### F. Who furnished the tools and place of performance

Here, Maduro determined the place of performance and furnished all the necessary tools for the unloading of the vessel, including the cables for attachment to the crane. Seaport, however, furnished the crane. Accordingly, this factor neither supports nor militates against a finding of borrowed servant status.

### G. How long did employee work for borrowing employer

■ This factor is significant only where the employment existed for a considerable length of time, and employments of a short duration will generally require a finding of neutrality as to this factor. *Capps,* 784 F.2d at 618 (employee injured first day on job).

In the instant case, the unloading of the Puenta Malvinas was only a three-day job. Accordingly, the Court finds that this factor is neutral with regards to borrowed servant status.

**H. Who had right to discharge employee**

This factor addresses the issue of whether Maduro had the right to terminate the operators' services with itself. *Hitt v. Cliffs Drilling Co.,* No. 92–2954, 1993 WL 488570, at *3 (E.D.La. Nov. 22, 1993); *Capps,* 784 F.2d at 618. In this regard, the record before the Court is silent. Accordingly, the Court finds that this factor is neutral.

**I. Who had obligation to pay employee**

Seaport rented the crane and crane operators to Maduro. In return, Maduro paid a daily, lump-sum fee for the crane rental.[6] Seaport then paid its operators. These facts set this case apart from those cases where the alleged borrowed employees maintained timesheets that were verified by the borrowing employer, and then given to the lending employer for the payment of wages. *See Brown v. Union Oil of California,* 984 F.2d 674, 679 (5th Cir.1993); *Alexander v. Chevron, U.S.A.,* 806 F.2d 526, 528 (5th Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). In those cases, the procedure for payment of wages generally supported a finding of borrowed servant status. While the Court recognizes that the rental fee for the crane in the instant case implicitly included an hourly operator charge, the Court concludes that Seaport had the obligation to pay its operators.

4. *Recap of the Ruiz factors.*

The Court has found that the most significant *Ruiz* factor, i.e., control, militates against finding a borrowed servant relationship between the crane operators and Maduro. Moreover, the majority of the remaining factors either weigh against a finding of borrowed servant status, or are neutral on the issue. In this regard, the few factors in favor of finding a borrowed servant status, namely, whose work is being performed and acquiescence of the employee, are greatly outweighed.

---

**6.** The invoice provided by Seaport to Maduro specified payment in "crane hours." However,

*CONCLUSION*

Based upon the foregoing considerations, the Court finds as a matter of law that the crane operators are not the borrowed servants of Maduro and, accordingly, Seaport is not immune from suit. Therefore, it is hereby

ORDERED AND ADJUDGED that Seaport Crane Service, Inc.'s motion for summary judgment is DENIED.

DONE AND ORDERED.

it also listed the names of the crane operators assigned to the job.